UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

ALLAN EKA,

                    Plaintiff,

          - against -

BROOKDALE HOSPITAL MEDICAL
CENTER,

                    Defendant.

-------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
14-CV-6468 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Allan Eka ("Eka" or "Plaintiff") brings this employment discrimination action against his current employer, Defendant Brookdale Hospital Medical Center ("Brookdale" or "Defendant"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), alleging that Brookdale subjected him to a hostile work environment[1] and disparate treatment based on his national origin, and retaliated against him for complaining about such discrimination by suspending him and refusing to hire him for other positions he applied for at Brookdale. Before the Court is Defendant's motion for summary judgment. For the reasons discussed below, the Court grants in part and denies in part Defendant's motion.

---

[1] Plaintiff does not specifically plead a hostile work environment claim as a separate count in his Complaint but integrates it into his other allegations.

## BACKGROUND

I.   **Facts**

A.      **Plaintiff's Hiring by Brookdale**

Plaintiff Allan Eka, who is of Nigerian national origin, works as a part-time Psychiatric Technician ("Psych Tech") at Brookdale. (Def. 56.1[2] ¶ 1, 14; Eka Def.[3] at 6.) The position is a non-exempt and non-managerial position. (*Id.* ¶ 4.) As a Psych Tech, Eka's duties include monitoring and ensuring the safety of patients, providing charts to nurses, laundering the hospital's linens and clothing, and assisting patients with bathing. (Def. 56.1 ¶ 18.) He began his employment with Brookdale in April 2005. (Def. 56.1 ¶ 1.) In January 2006, he resigned from his position, and, in July 2006, Brookdale rehired him as a part-time Psych Tech. (*Id.* ¶¶ 2–3.) Before he started working at Brookdale, he worked for Holliswood Hospital ("Holliswood"). (Dkt. 41 ("Eka Dec.") ¶ 2.) Jeannette Metelus ("Metelus"), a Nurse Manager who worked at both Holliswood and Brookdale, invited Eka to interview for a Psych Tech position at Brookdale. (Eka Dec. ¶ 3.) After interviewing with Metelus and Evelyn Joseph ("Joseph"), another Nurse Manager at Brookdale, Eka was hired. (Eka Dec. ¶ 3.) According to Plaintiff, the interview was a formality because Brookdale was opening a new child psychiatry unit and had urgent staffing needs. (Eka Dec. ¶ 3.) Eka's resume and employment application, which were submitted to Brookdale for the interview, stated that he attended high school and college in Nigeria. (Def. 56.1 ¶ 12.) However,

_____

[2] Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

[3] References to "Eka Def." are to Dkt. 36-1, Defendant's Exhibit 2, which contains excerpts from Eka's deposition testimony on July 31 and August 20, 2015. References to "Eka Pl." are to Dkt. 42-1, which contains Plaintiff's submission of excerpts from Eka's deposition testimony. Page citation is to the page number of the deposition transcript.

the parties dispute whether Joseph was aware of Eka's Nigerian national origin before he was hired.[4]  (*See* Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13.)

## B.    Eka's Position & Shifts as a Psych Tech[5]

Eka usually worked in the child psychiatry unit located on the eighth floor of the Community Health Center building ("8 CHC").  (Def. 56.1 ¶ 19; Eka Def. at 6–7.)  He also worked on the thirteenth floor of the CHC ("13 CHC"), the fifth floor of the Snapper Building ("Snapper 5"), and the Psychiatric Emergency Room ("Psych ER").  (Def. 56.1 ¶ 19.)  Psych Techs could be diverted from their scheduled assignment when there is need in another unit.  (Eka Def. at 31, 33.)  This is known as "floating."  (*Id.* at 31.)  Joseph, whose national origin is Haitian, was the Nurse Manager for 8 CHC, and she supervised Eka from 2006 until she resigned on July 25, 2010.  (Def. 56.1 ¶¶ 5–6, 15; Eka Def. at 8.)  Joseph reported to Trevor Grazette ("Grazette"), the Director of Nursing.  (Def. 56.1 ¶¶ 7–8.)  After Joseph resigned, Eka was supervised by Myrtle Robinson until 2014, and then by Margaret "Peggy" O'Rourke until mid-2015.  (Eka Def. at 7–10.)  He is currently supervised by Susan Dietz and Metelus.  (*Id.* at 9–11.)

Psych Techs work one of three eight-hour shifts: 8:00 a.m. to 4:15 p.m. (the "Day Shift"), 4:00 p.m. to 12:15 a.m. (the "Afternoon Shift"), and 11:55 p.m. to 8:10 a.m. (the "Night Shift").  (Def. 56.1 ¶ 20.)  Since 2006, Eka has typically worked the Afternoon Shift (Def. 56.1 ¶ 21; Eka Def. at 6).  Joseph worked the Morning Shift.  (Def. 56.1 ¶ at 22.)  Eka works between three and

---

[4] While Eka testified that he gave Metelus and Joseph his resume (Eka Pl. at 57–58), he also states, in his 56.1 Counter-Statement, that he submitted the resume to Brookdale and that he is unable to recall providing the resume to Metelus and Joseph during the interview (*id.* at 58–59).  Notwithstanding the discrepancy in Plaintiff's own evidence, he asserts that, "there is no evidence whatsoever to establish that Joseph was aware that Eka was Nigerian before Brookdale hired him".  (Pl. 56.1 ¶ 13.)

[5] Unless otherwise indicated, these facts relate to both periods of Eka's employment at Brookdale.

six shifts per week.  (Eka Pl. at 55.)  He can also apply for additional shifts, including overtime, by signing up at the bottom of the monthly schedule of employee shifts.  (Def. 56.1 ¶ 24; Eka Def. at 22.)  Psych Techs working on 8CHC interested in signing up for extra shifts must physically write their name down on the monthly or weekly schedule, and Joseph would distribute extra shifts among those who signed up.  (Def. 56.1 ¶ 26; *see also* Eka Dep. at 27, 33.)  At times, when Eka has sought out additional shifts, his requests have been denied and those shifts have been given to other employees.  (Eka Dec. ¶ 4.)  At other times, Eka has been offered additional shifts that he has turned down without penalty.  (Def. 56.1 ¶ 28.)

### C.    Performance Reviews

Joseph completed Eka's performance reviews from 2005 to 2010.  (Def. 56.1 ¶¶ 31–35.) From 2005 to 2007, Eka received the highest rating at the time: "satisfactory."  (Def. 56.1 ¶¶ 31–33.)  In 2007, the rating system was changed to a numerical scale, from 0 to 3, with 3 the highest rating.  (Def. 56.1 ¶¶ 34–35.)  For 2007-2008, Joseph gave Eka an overall rating of 2.9; for 2008-2009, Eka received a 3.  (Def. 56.1 ¶¶ 34–35.)  In subsequent years, other managers continued to give Eka high ratings.  (Def. 56.1 ¶ 37.)  However, with the exception of his 2005 and 2009-2010 reviews, his supervisors noted problems in Eka's performance reviews regarding his punctuality and attendance.  (Def. 56.1 ¶¶ 36–38.)  Eka had received two verbal warnings and one written warning for those issues.  (Def. 56.1. ¶ 39.)

### D.    Joseph's Comment about Eka's National Origin & the 2008 Complaint to Brookdale Management

Eka alleges that, during his 2007-2008 performance review meeting with Joseph on or about October 3, 2008, she made a comment about Eka's national origin, noting that Nigerians are "difficult people" or are "difficult to work with," and do not like to be "controlled."  (Eka Def. at 61–75; Def. 56.1 ¶ 41.)  According to Eka, Joseph initially noted that he needed to improve his

personal and professional development (Eka Def. at 66.)  Eka voiced his disagreement with this assessment, noting that he was attending school.  (*Id.* at 65–66.)  Joseph then changed the evaluation in Eka's favor, giving him a 2.9 out of 3.  (*Id.* at 67–68.)  When they met again later to discuss the amended review, Eka alleges that Joseph made the comment about Nigerians.  (Eka Def. at 67–68; Def. 56.1 ¶ 41.)  When Eka told Joseph that he was offended, Joseph allegedly replied, "I don't care.  It's your word against mine."  (Eka Def. at 72–75)

In November or December 2008, Eka filed a verbal complaint with Grazette, Joseph's supervisor, about Joseph's comments.  (Eka Dec. ¶ 6.)  However, there is no record indicating that Grazette referred this complaint to Brookdale's Human Resources ("HR") Department—as required by Brookdale's policy—or that there was any type of investigation.[6]  (Eka Pl. at 79, 85; Pl. Ex. 5 at 213–17, 219.)  Eka alleges that after he complained to Grazette, Joseph treated Eka less favorably than she had before.  (Eka Dec. ¶ 7.)  Joseph made it even harder for Eka to obtain additional and overtime shifts, scolded him for speaking to his colleagues about patients at shift changes and for drinking water during his shift, gave him undesirable work, did not greet him at shift changes, and selectively enforced rules against him.  (*Id; see also* Pl. 56.1 ¶ 40; Eka Pl. at 88.)

### E.    Eka's May 2009 Complaint to Brookdale Management

Plaintiff alleges that in May 2009, he filed a written complaint of discrimination and retaliation to Grazette, stating that Joseph treated him less favorably than his co-workers who were not Nigerian.  (Eka Dec. ¶ 8; Pl. 56.1 ¶ 91.)  In the complaint, Plaintiff also stated that Joseph

---

[6] Margaret Brubaker, Brookdale's Senior Vice President of Human Resources, testified that "if a complaint was made to [Grazette] in 2008 of discrimination, that complaint should have been referred to [HR]" and that HR "should have reviewed records, documents, interviewed witnesses and all data concerning any allegation."  (Pl. Ex. 5 at 213–14.)

retaliated against him for making the 2008 verbal complaint to Grazette.[7]  (Eka Dec. ¶ 8; Pl. 56.1 ¶ 91.)  Grazette, however, did not respond to this 2009 complaint.  (Eka Pl. at 81.)

### F.    Eka's July 2009 Suspension

On July 5, 2009, Joseph and Grazette suspended Eka for engaging in disruptive or inappropriate behavior and insubordination (Pl. Ex. 6), when Eka refused to float to another unit as directed by Joseph (Def. Ex. 34).  The parties dispute whether Joseph had the authority to direct Eka to float to other units that evening.  (Def. 56.1 ¶ 52–53; Pl. 56.1 ¶ 52–53.)  That day, when Eka arrived at work for an Evening Shift, he was told by a co-worker that Joseph had directed Eka to float from 8 CHC to Snapper 5.  (Def. 56.1 ¶ 51.)  Joseph was not at the hospital at that time.  (Def. 56.1 ¶¶ 51, 53; Def. Ex. 34.)  Instead of going to Snapper 5, Eka called the nursing office to see whether there was truly a need for additional staff on Snapper 5.  (Def. 56.1 ¶ 52.)  When Joseph received a call from someone at the hospital that Eka refused to float, she called the hospital and spoke to Eka, directing him again to go to Snapper 5.  (Def. 56.1 ¶ 52–53; Def. Ex. 34.)  The phone conversation between the two became heated, and Eka admits that he "raise[d] his voice a bit so that Joseph could hear him repeatedly telling her that he would float if proper procedure/practice were followed."  (Pl. 56. ¶ 54.)  According to Eka, Joseph lost her temper while they were on the phone. (Pl. 56.1 ¶ 54.)  When Eka refused to follow Joseph's directions and asked that the directive come from a supervisor who was on duty, Joseph directed Eka to leave the hospital.  (Def. 56.1 ¶ 56; Eka Def. at 144, 150–51; 155 (Joseph told Eka either to work at Snapper 5 or "punch out" for the Evening Shift)).  The parties dispute as to whether Eka cursed at Joseph.  (*Compare* Def. 56.1 ¶ 56 and Def. Ex. 34 (Joseph's letter to Grazette stating that Eka cursed at

---

[7] Neither party has submitted this written complaint into the summary judgment record.  Plaintiff testified that he did not keep a copy of the complaint (Eka Pl. at 81).  However, it does not appear that Defendant disputes that Grazette received Eka's letter.

her) *with* Eka Pl. at 169 (testifying that Joseph lied about him cursing at her) and Def. Ex. 33 at ECF[8] 113 (stating in his August 3, 2009 grievance letter that he did not curse at Joseph).) Eka left the hospital, but only after another supervisor who was on duty at the time, Sonia Williams, directed him to go home. (Eka Def. at 155.) The next day, July 6, 2009, Eka was notified that he was on indefinite suspension. (Eka Def. at 144; Def. 56.1 ¶ 60; Def. Ex. 36.)

The Union filed a grievance on Eka's behalf concerning his July 2009 suspension. (Def. 56.1 ¶ 61.) On July 24, 2009, Grazette wrote a letter to Eka requesting a written statement concerning the events precipitating his July 2009 suspension. (Def. 56.1 ¶ 62.) On June 15, 2010, a grievance hearing was held concerning the suspension. (Def. 56.1 ¶ 63.) After review, Eka's indefinite suspension was converted to a suspension for the time he was out of work, approximately six weeks. (Def. Ex. 36.)

### G.     Eka's Additional 2009 Complaints of Discrimination and Retaliation

In addition to his 2008 and May 2009 complaints, Eka made additional complaints, mainly about Joseph, to Brookdale management, and eventually filed a charge of discrimination with the EEOC (the "EEOC Charge"). (Pl. 56.1 ¶ 82; Pl. Ex. 9.)

On July 21, 2009, Eka filed a written complaint to Brookdale's President/Chief Executive Officer, Executive Vice President/Chief Operating Officer, and Executive Vice President/Chief Financial Officer. (Pl. Ex. 7.) The complaint was entitled "Deliberate Waste of Hospital Funds" and complained about Joseph favoring some staff members and awarding shifts to Eka's co-workers but not to him. (*Id.* at ECF 2–3.) He stated that "[t]his is a case of discrimination." (*Id.* at ECF 3.) He went on to discuss, *inter alia*, the amount of money Brookdale may have lost

---

[8] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

because of Joseph's decisions regarding shift allocation. (*Id.* at ECF 3–5.) He did not receive a response. (Pl. Ex. 8 at ECF 2.)

On September 17, 2009, Plaintiff filed an additional complaint to the same officials, entitling it "Retaliation or Discrimination or Nepotism/Favoritism." (Pl. Ex. 8 at ECF 2.) Eka complained that a shift available on September 10, 2009, was given to a full-time staff member instead of him. (*Id.*) He stated, "I have complained about [full-time staff receiving extra shifts and thus getting overtime pay] and I think I am being deliberately retaliated or discriminated against, or nepotism is at work . . . . Why am I being either retaliated, or discriminated against? I never thought I did anything wrong by blowing the whistle on everything (negative) going on." (*Id.* at ECF 2–3.)

On September 23, 2009, Brookdale's Assistant Director of Labor Relations Trina Cornet ("Cornet") wrote a letter to Plaintiff to schedule a meeting to discuss his September 17, 2009 complaint, also indicating that Brookdale's HR Department had initiated an investigation of Eka's claims. (Pl. Ex. 10; Def. 56.1 ¶ 97.) Sometime thereafter, Cornet and Brenda Lee ("Lee"), Director of Human Resources), met with Eka to discuss his September 17, 2009 complaint (Pl. Ex. 10; Pl. Ex. 13 at ECF 3[9]). Brookdale also interviewed Joseph after receiving or in connection with Eka's complaint. (Pl. Ex. 5. at 229-31.)

Thereafter, on or about October 2, 2009, Plaintiff submitted another complaint to Lee and Cornet, stating that Joseph required him, rather than another co-worker, to float.[10] (Pl. Ex. 12 at ECF 2–3.) He again noted that Joseph's staffing decision was unjustified because it was a "waste

---

[9] While there is no evidence in the record as to when this meeting occurred, Eka does not dispute that it took place. (*See* Pl. Ex. 13 at ECF 3 (Plaintiff's November 13, 2009 letter to Brookdale management mentioning that Eka was "called to a meeting" with Trina and Lee.).)

[10] The letter referenced incidents that purportedly occurred on September 26 and 27, 2009.

of funds." (*Id.*) The complaint stated that Eka "believ[ed] strongly that . . . Joseph [was] retaliating and discriminating against [him]." (*Id.*)

In a November 13, 2009 complaint to Cornet, Eka stated that he volunteered for an extra shift without having been told that he would be required to float to the Psych ER. (Pl. Ex. 13 at ECF 2.) When he found out that he would be floated to the Psych ER, he asked to be relieved of the shift. (*Id.*) The complaint stated that even when someone else volunteered to float instead of Eka, Joseph did not allow it and told the other employee to "stay out of it and [that] it wasn't their business." (*Id.*) According to the letter, when Eka told Joseph that he would go speak to Grazette about it, Joseph replied "you can go to anyone, that's all you have been doing anyways", and then refused to give Eka permission to leave the floor. (*Id.*) Plaintiff asserted that Joseph was harassing him and discriminating and retaliating against him. (*Id.*)

On January 22, 2010, Eka filed an EEOC Charge that included allegations of employment discrimination on the basis of his national origin and of retaliation. (Pl. Ex. 9 at 2, 4.) Eka specifically noted, *inter alia*, Joseph's comments about Nigerians. Brookdale received a Notice of Charge of Discrimination dated September 24, 2012. (Def. Ex. 46.) By letter dated January 10, 2013, Brookdale was notified by the EEOC that Eka's charge was being transferred from the EEOC's ADR Unit to its Enforcement Unit for investigation and that Brookdale must submit its position statement or respond to Eka's allegations by February 1, 2013. (Def. Ex. 45.) On December 19, 2013, the EEOC issued a finding of probable cause on Eka's allegations. (Def. 56.1 ¶ 87.)

In an April 2, 2010 letter to Lee and Cornet concerning his July 2009 suspension, Eka requested backpay for the period of his suspension, *i.e.*, July 5, 2009 through August 21, 2009. (Def. Ex. 32.) Even after Joseph resigned, Eka wrote ten more letters to Brookdale's management

complaining about shift assignments, discrimination, retaliation and nepotism, and patient-to-staff ratio. (Def. 56.1 ¶ 101–110.)

## H.    Complaints by Other Employees About Joseph's Management Style

Eka was not the only employee who complained about Joseph's management style and personality; non-Nigerian employees also complained. (Def. 56.1 ¶ 66–67; Def. Exs. 25, 26.) For example, Garnice Barnette, who is "from the [Caribbean] islands" as is Joseph, complained that Joseph was "not a nice person," a liar who disrespected her staff and treated her staff like "kids." (*Id.* ¶ 67; Def. Ex. 25.) Two other employees, Virginia Buisson and Marie Cantave ("Cantave")— both of whom are, like Joseph, Haitian—also complained about Joseph's mannerism. (Def. 56.1 ¶ 69.) Cantave complained about Joseph's threats against anyone who questioned her directives and Joseph's scheduling decisions, noting that Joseph did not allow her to switch shifts with another consenting co-worker. (Def. Ex. 26[11]; Pl. Ex. 32 (requesting backpay for the period of suspension).)

## I.    Brookdale's Offers of Full-Time Employment to Eka

At Brookdale, open bargaining-unit positions are filled based on seniority, as long as the applicant is qualified. (Pl. 56.1 ¶ 72.) Similarly, part-time Psych Techs are offered full-time

---

[11] Plaintiff objects that Defendant's Exhibit 26, which is Cantave's written complaint about Joseph to Brookdale management, is inadmissible hearsay. While that might be correct, it does not bar the Court's consideration of the substance of those declarations at this stage, *i.e.*, that Joseph was considered a bad manager by non-Nigerians. *See Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) (noting that "even inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial"); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents"), *cert. denied*, 541 U.S. 937 (2004). These statements are also relevant and admissible evidence regarding complaints of which Defendant was aware—regardless of their truth—at the time Defendant was considering whether and how to respond to Plaintiff's allegations of "discrimination" and "retaliation" by Joseph.

positions based on seniority. (Def. 56.1 ¶ 73.) Eka was offered a full-time Psych Tech position on at least four occasions in 2008, 2010, 2014, and 2015. (Def. 56.1 ¶ 75.) He turned down those offers. (Def. 56.1 ¶ 76.) While Defendant assert that Eka did so because his other jobs conflicted with the schedule of a full-time position, Eka denies this, and instead claims that he declined these offers because "he wanted 'something more than a psych tech position.'" (*See* Def. 56.1 ¶ 77, 78–79; Eka Pl. 41–46; Pl. 56.1 ¶ 78–79.) He testified that given his high qualifications, Brookdale's offer for full-time employment as a Psych Tech was an act of retaliation for filing complaints. (Eka Pl. 41–46.)

### J.    Denial of Eka's Applications For Other Positions at Brookdale

In 2013 and 2014, after Eka received a Master's degree in Business Administration from Mercy College, he applied to approximately fourteen full-time, non-union jobs at Brookdale. (Simpson Decl. ¶ 16; Pl. 56.1 ¶ 111; Eka Pl. at 344–47.) Plaintiff was not hired for any of them. (*See* Def. 56.1 111–24.) Specifically, Eka applied for the following: Payroll Auditor; Inpatient Accounting Manager; Ambulatory Care Manager; Accounts Payable – Special Projects Manager; Laboratories Administration – Office Manager; Building Services Supervisor – Housekeeping; Information Systems, Epic Report Writer; Surgery Office Manager; Accounts Payable – Billing Manager; Auditor-Finance; Junior Treasury Clerk; Program Associate – Treatment for Life; Cardiac Catheterization Laboratory Supervisor; and Transportation Supervisor. (Simpson Decl. ¶ 16; Pl. 56.1 ¶ 111; Eka Pl. at 344–47.)

Of the fourteen jobs for which he applied, Plaintiff received one interview, for a Transportation Supervisor position. (Eka Pl. at 341, 344.) According to Eka, the interviewer "guaranteed" that Eka would receive one of the three open positions, and told Eka that the interviewer's hiring recommendation would be taken to the vice president for approval. (Eka Pl. at 344–345.) But when Eka ran into the interviewer weeks later, the interviewer said that he

"would [have] love[d] to hire [Eka]" but that his "hands [were] tied" because of Eka's previous complaints.  (*Id.* at 346-47.)

## II.    Procedural History

Plaintiff filed this suit on November 3, 2014.  (Dkt. 1, Compl.)  Defendant filed its answer on January 7, 2015.  (Dkt. 10.)  The Defendant's motion for summary judgment was fully briefed on August 12, 2016.  (Dkt. 37.)

## DISCUSSION

## I.    Summary Judgment Standard

A defendant seeking summary judgment must establish that "there is no genuine dispute as to any material fact," and that it is thus "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Genuine" disputes exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).  Once the moving party has met this initial burden, the nonmoving party must "designate specific facts showing that there *is* a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (emphasis added; quotations omitted).  The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations and quotations marks omitted).  In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation marks omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 8*, 691 F.3d 134, 141 (2d Cir. 2012) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Second Circuit has "explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." *Thompson v. Kaufman's Bakery, Inc.*, No. 03-CV-340S, 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005) (citation and quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (noting that "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions" (citation and quotation marks omitted)). Nevertheless, the "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 998, 998 (2d Cir. 1985); *see also Abdu-Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."); *Marmulszteyn v. Napolitano*, 08-CV-4094, 2012 WL 3645776, at *5 (E.D.N.Y. Aug. 22, 2012) ("Although the Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question, summary judgment in such a case may still be warranted if the plaintiff relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." (internal quotations and alterations omitted) (quoting *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 227–28 (S.D.N.Y. 2007))). "When no rational jury could find in favor of the nonmoving party because

the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II. Plaintiff's Claims[12]

### A. Discrimination Claims Pursuant to Title VII and the NYSHRL

The Court analyzes Plaintiff's Title VII and NYSHRL discrimination claims using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McGill v. Univ. of Rochester*, 600 F. App'x 789, 790 (2d Cir. 2015) (summary order) (applying *McDonnell Douglas* to both Title VII and NYSHRL discrimination claims). *McDonnell Douglas* has "established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) ("*Hicks*"). Under this framework, to defeat a motion for summary judgment, the plaintiff must first establish a *prima facie* case of discrimination by showing (1) membership in a protected class; (2) qualification for the job; (3) an adverse employment action; and (4) circumstances surrounding the adverse employment action that give rise to an inference of discrimination. *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014). The plaintiff's burden of establishing a *prima facie* case is "not onerous," *Tex. Dep't of Cmty. Affairs. v. Burdine* (*Burdine*), 450 U.S. 248, 253 (1981), and "minimal," at best, *Hicks*, 509 U.S. at 506.

If the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to proffer a legitimate, non-discriminatory justification for its adverse employment action against the plaintiff. *Hicks*, 509 U.S. 506–07; *see*

---

[12] Although Plaintiff has not submitted into evidence his August 29, 2014 Notice of Right to Sue issued by the EEOC (*see* Compl. ¶ 13), Defendant has not challenged the timeliness of Plaintiff's filing of this suit. Therefore, the Court presumes that Plaintiff has brought this case within 90 days of receiving a right-to-sue letter from the EEOC.

*Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (citing *McDonell Douglas*, 411 U.S. at 802). Even though the defendant has the burden to produce evidence of their nondiscriminatory reasons, such evidence is not subject to attack by way of a "credibility assessment." *Hicks,* 509 U.S. at 509; *see also Burdine,* 450 U.S. at 254 (noting that "defendant need not persuade the court that [an employment action] was actually motivated by the proffered reasons"). Once the employer comes forward with a non-discriminatory explanation, "the presumption 'drops out of the picture' and the *McDonnell Douglas* framework 'is no longer relevant.'" *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (quoting *Hicks*, 509 U.S. at 510–11). Then, the final and ultimate burden is on the plaintiff to offer evidence that the defendant's reason is a mere pretext for intentional discrimination. *Id.* at 307–08 ("[T]he plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her.")*; see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). At this last stage, the "plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false[.]" *Weinstock*, 224 F.3d at 42 (citing *Van Zant v. KLM Royal Dutch* Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (internal quotations omitted)); *see Kirkland*, 760 F.3d at 225 (2d Cir. 2014) (citing *Terry*, 336 F.3d at 138). "To get to the jury, [i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Weinstock*, 224 F.3d at 42 (citing *Hicks*, 509 U.S. at 519). Although the *McDonnell Douglas* framework shifts the burden of production between the plaintiff and the defendant, at all times the burden of persuasion rests with the plaintiff to demonstrate discrimination, *Hicks*, 509 U.S. at 518, and the ultimate issue to be determined is

"discrimination [or lack thereof]."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

1.    Step 1: *Prima Facie* case

Brookdale does not dispute the first two elements of Plaintiff's *prima facie* case—that Eka belongs to a protected group based on his Nigerian national origin and that he is qualified for his current job.  However, the parties dispute whether Plaintiff has demonstrated the third and fourth elements—that he suffered adverse employment actions and that such actions occurred under circumstances giving rise to an inference of discrimination.  For the reasons set forth below, the Court finds that Plaintiff has established a *prima facie* case of discrimination.

a.    Adverse Employment Action

An employee sustains an "adverse employment action" if he "endures a materially adverse change in the terms and conditions of employment. . . . An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citation and quotation marks omitted); *see also Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015).  Examples that may constitute adverse employment actions include "termination of employment, demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. N.Y. City Human Res. Admin*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting *Terry*, 336 F.3d at 138).

Here, the adverse employment actions of which Eka complains are his July 2009 suspension and "the ongoing campaign to limit Plaintiff's additional and overtime shifts."[13]  (Pl.

_____

[13] Although Plaintiff alleges that Joseph selectively enforced rules unfavorably against Plaintiff and that he was not hired for the numerous jobs to which he applied, he does not assert

Opp. at 13.) He contends that both of these adverse employment actions occurred under circumstances that give rise to an inference of discrimination.

### i. July 2009 Suspension

Plaintiff's 2009 six-week suspension without pay, which is undisputed (Def. 56.1 ¶¶ 60, 100), was a materially adverse change in the conditions of his employment. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (finding suspension without pay for one week sufficient to constitute adverse employment action for purposes of establishing *prima facie* retaliation claim); *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 306 (E.D.N.Y. 2014) (finding suspension without pay while employee was investigated for fraud constituted adverse employment action for Title VII discrimination claim); *Hill v. Rayboy–Brauerstein*, 467 F. Supp. 2d 336, 355-56 (S.D.N.Y. 2006) ("Plaintiff's ten-day suspension [without pay] is an adverse employment action, as it is a material alteration of Plaintiff's working conditions."); *Hughes v. City of Rochester*, 12–CV–6112, 2016 WL 4742321, at *6 (W.D.N.Y. Sept. 12, 2016) (finding, in a Title VII disparate impact case, that an employer's decision to place plaintiff on unpaid leave was an adverse employment action).

### ii. Denial of Extra Shifts & Overtime

Denial of extra shifts and overtime also constitutes an adverse employment action. *See Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (to constitute an "adverse employment action," plaintiff must present evidence that the action deprived plaintiff of some "tangible job benefits such as compensation, terms, conditions, or privileges of employment" (citation and quotation marks omitted)); *see also Duzant v. Elect. Boat Corp.*, 81 F. App'x 370, 372 (2d Cir.

that those constitute adverse employment actions for purposes of his discrimination claim. (*See* Pl. Opp. at 12-13.)

2003) (vacating district court's granting of summary judgment to defendant and remanding where plaintiff alleged that all other employees in his department received overtime hours while he, the only African American, did not); *Mclean v. Metro. Jewish Geriatric Ctr.*, No. 11–CV–3065, 2013 WL 5744467, at *10 (E.D.N.Y. Oct. 23, 2013) (noting that denial of "opportunities to earn overtime pay, if proven, could constitute an adverse employment action because it resulted in a loss in compensation").

Plaintiff's evidence regarding this adverse employment action consists of: (1) his own assertion that Joseph denied him extra shifts and overtime—found in his deposition testimony, the declaration he has submitted in opposition to the instant motion, and two of his complaint letters; (2) a printed one-week staffing schedule, which shows that Eka signed up for three extra shifts that were instead given to his non-Nigerian co-workers; and (3) records reflecting the increase in the total number of shifts Eka received once Joseph was no longer responsible for staffing decisions.[14] (*See* Pl. Opp. at 12–13; Pl. Ex. 2; *see also* Dkt. 35 ("Simpson Dec.") at ECF 1.) Eka stated, in his declaration, that "the lion's share of shifts . . . went to [his] fellow Psych Techs from the West Indies." (Eka Dec. ¶ 4.)[15] Furthermore, Eka also asserts that the number of shifts that he received

---

[14] The Court is puzzled by Plaintiff's decision to only provide one week of the staffing schedule when Plaintiff has worked at Brookdale for several years. Plaintiff argues, without any supporting evidence, that "[t]here are numerous other, similar documents establishing Joseph's discriminatory campaign of awarding more additional shifts and overtime to the non-Nigerian Psych Techs, but Brookdale has lost or destroyed these records." (Pl. Opp. at 13.) This argument requires little discussion given that Plaintiff has not even attempted to establish spoliation of evidence that would permit an adverse jury instruction. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (outlining the requirements for a party seeking an adverse inference instruction based on the destruction of evidence); *see also Bryndle v. Boulevard Towers, II, LLC*, 132 F. Supp. 3d 486, 502 (W.D.N.Y. 2015) ("The party seeking sanctions bears the burden of establishing all elements of a claim for spoliation of evidence." (*quoting Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008)).

[15] Given that employees had access to weekly or monthly schedules that identified which employee would work each shift, Eka's allegation that other non-Nigerian employees were being awarded more shifts is based on personal knowledge, and thus would likely be admissible at trial.

increased by 35% once Joseph was no longer responsible for staffing decisions.[16]  (Pl. Opp. at 13.)

Although Defendant contests Eka's calculation of the increase,[17] even accepting Defendant's

calculation, the evidence shows a trend of increased shifts over time that a jury could find supports

Eka's claim that once Joseph left, he was able to obtain more shifts.[18]

Recognizing that Plaintiff's burden to establish a *prima facie* case of discrimination is not

demanding, the Court finds that this evidence is sufficient to establish the third element of adverse

action.  *See Abdu-Brisson*, 239 F.3d at 467 ("[P]laintiff's burden of establishing a *prima facie*

[Title VII] case is *de minimis*."); *Mazyck v. Metro Transp. Auth.*, 893 F. Supp. 2d 574, 589

(S.D.N.Y. 2012) ("[P]laintiff's *allegation* that he was denied opportunities for overtime satisfies

the third prong of his *prima facie* case, as denial of overtime can constitute an adverse employment

action." (emphasis added)).

---

(*See* Eka Pl. at 24, 25, 28 (noting that the schedules showed the number of staff per day for each shift and the names of the employees who were scheduled to work those shifts).)

[16] It is unclear how Plaintiff got to 35%.  According to evidence in the record, Eka worked 149 shifts in 2010 and 197 shifts in 2011.  (Simpson Dec. at ECF 1.)  This represents a 32% increase—obtained by dividing the difference in the number of shifts from 2010 to 2011 (48 shifts) by the number of shifts Eka worked in 2010 (149).  In any case, this seeming inaccuracy is inconsequential to the Court's holding because, as explained below, the number of shifts Eka received each year after Joseph's departure did increase.

[17] During "the period January 1, 2010 through July 25, 2010, [ ] Joseph's last day, Eka worked 105 shifts, or 15 a month.  This extrapolates to 180 shifts a year," which is more than the 168 shifts he worked in 2009.  (Dkt. 45, Lorick Dec. ¶ 2.)

[18] Using Defendant's extrapolation of the number of shifts Eka was on pace to work during 2010, the following is the overall trend: 168 shifts in 2009; 180 shifts (rather than 149) in 2010; 197 shifts in 2011; 202 shifts in 2012; 227 shifts in 2013; and 228 shifts in 2014.  (Lorick Dec. ¶ 2; Simpson Dec. at ECF 1.)

b. Inference of Discrimination

An adverse employment action can be shown to have occurred under circumstances giving rise to an inference of discrimination through evidence of, *inter alia*, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (citation and quotation marks omitted).

Plaintiff contends that both adverse employment actions—the 2009 suspension and denial of extra shifts and overtime—occurred under circumstances that give rise to an inference of discrimination. Plaintiff's evidence of discriminatory intent falls into three categories: (1) Joseph's comments to Eka about Nigerians, (2) Brookdale's repeated failure to investigate Plaintiff's numerous complaints, and (3) instances of disparate treatment, where non-Nigerians (*i.e.*, all other employees) were more favorably treated. Focusing only on the 2009 suspension as a potential adverse employment action, Defendant asserts that Plaintiff cannot establish that the suspension occurred under circumstances giving rise to an inference of discriminatory intent because Joseph's remarks about Nigerians were made nine months before Eka's suspension. As explained below, the Court finds that Plaintiff has produced enough evidence to meet his *de minimis* burden of raising an inference of discriminatory intent by Joseph. *Cf. Graham v. Long Island R.R.*, 230 F.3d 34, 41–42 (2d Cir. 2000) (noting district court's consideration of defendant's evidence was "premature" at the *prima facie* stage and explaining that "only [plaintiff's] evidence should be considered when deciding whether plaintiff has met his initial burden").

i. Stray Remark

Eka's only direct evidence of discrimination are Joseph's comments, said on a single occasion, that Nigerians are "difficult people" or are "difficult to work with," and that they do not

like to be "controlled".  (Eka Def. at 71–75; *see also* Pl. Opp. at 14.)  *See Littlejohn*, 795 F.3d at 312 (circumstances giving rise to an inference of discrimination can be shown through evidence of, *inter alia*, employer's "invidious comments about others in the employee's protected group").

In considering whether such remarks are "probative of discrimination" or merely non-probative "stray remarks," a court should consider four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharm.*, 616 F.3d 134, 149 (2d Cir. 2010); *Pronin v. Raffi Custom Photo Lab*, 383 F. Supp. 2d 628, 637 (S.D.N.Y. 2005); *see also Sethi v. Narod*, 12 F. Supp. 3d 505, 539 (E.D.N.Y.2014); *Mosberger v. CPG Nutrients*, Civ. No. 01100, 2002 WL 31477292, at *7 (W.D. Pa Sept. 6, 2002) ("Discriminatory stray remarks are generally considered [to fall] in one of three categories—those made (1) by a non-decisionmaker; (2) by a decisionmaker but unrelated to the decision process; or (3) by a decisionmaker but temporally remote from the adverse employment decision." (internal quotations and citations omitted)).

The comments about Nigerians were made by Joseph, a decision maker for Eka's 2009 suspension[19] and his requests for extra shifts and overtime (Eka Pl. at 7, 20, 33).  *See Owens v.*

---

[19] Despite the fact that Joseph was Plaintiff's direct supervisor when he was suspended in July 2009, it is not clear from the record that she was the decision maker with respect to that suspension.  While it is undisputed that the incident during which Joseph ordered Eka to float to Snapper 5 and Joseph's resulting insubordination was the basis for the July 2009 suspension, the record does not specifically indicate that Joseph made the decision to suspend Eka, though that decision was made immediately after the incident, and Eka was notified of it the very next day. Resolving all ambiguities and drawing all permissible factual inferences in Plaintiff's favor, as it must, *see Terry*, 336 F.3d at 137, and in the absence of any contrary evidence, the Court

*N.Y.C. Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (finding that discriminatory remarks by "individuals with substantial influence over [plaintiff's] employment" are relevant in determining whether an employment decision was motivated by discriminatory intent).  However, Joseph's alleged discriminatory comments were made around October 2008, nine months before Plaintiff's July 2009 suspension.  (Eka Def. at 61–75; Pl. Ex. 6.)  "Although there is no bright line rule regarding what length of time renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination," Joseph's comments were too far removed in time from Eka's suspension to raise an inference of discriminatory intent, in themselves, with respect to that adverse action.[20]  *See Ellis v. Century 21 Dept. Stores*, 975 F. Supp. 2d 244, 276 (E.D.N.Y. 2013) (noting that "courts in this Circuit have generally found that a five month lapse between an allegedly discriminatory statement and an adverse employment action is too long a gap to find the remark probative of discrimination without some other evidence that the remark was related to the adverse employment action" (collecting cases)); *see also Del Franco v. N.Y. City Off–Track Betting Corp.*, 429 F. Supp. 2d 529, 537 (E.D.N.Y. 2006) (finding no probative value of allegedly discriminatory comment made "slightly more than three months" prior to termination), *aff'd*, 245 F. App'x 42 (2d Cir. 2007).[21]  Therefore, Joseph's comments, standing alone, do not raise an

concludes that a jury could find that Joseph qualifies, at least, as *a* decision maker with respect to Eka's 2009 suspension.  This is not to say that the evidence shows that Joseph was the sole, or even key, decision maker for the suspension; indeed, the Court presumes that Eka's suspension had to be reviewed and approved by one or more levels of management beyond Joseph.

[20] In his opposition to Defendant's motion, Plaintiff does not address the argument that a nine-month gap between Joseph's comment and the 2009 suspension is too large for the comment to be probative of discrimination.  (*See* Pl. Opp. at 14.)

[21] Plaintiff's conclusory argument that "a reasonable juror could easily view [Joseph's comments] as discriminatory" fails to address the temporal attenuation issue.  Plaintiff cites to *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314 (2d Cir. 1992).  However, in *Levin*, an age discrimination case, the plaintiff had been subjected to a number of negative remarks, as opposed

inference of discrimination as to the Plaintiff's suspension. *See Whethers v. Nassau Health Care Corp.*, No. 06–cv–4745, 2013 WL 3423111, at *6 (E.D.N.Y. Jul. 8, 2013) ("A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.").

However, "while it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, . . . when other indicia of discrimination are properly presented, the remarks can no longer be deemed stray, and the jury has a right to conclude that they bear a more ominous significance." *Abdu-Brisson*, 239 F.3d at 468 (citation and quotation marks omitted). That is the case here. There is evidence that Joseph's alleged discriminatory comments were made during the period when she was limiting Plaintiff's overtime opportunities. (Eka Pl. 69–70; Eka Dec. ¶¶ 5, 7.) Specifically, Eka states, in his declaration, that once Joseph made the comment about Eka's national origin, he realized that her past decisions about who received additional shifts and overtime were motivated by discrimination. (*See* Eka Dec. ¶¶ 4, 5.) Eka has also documentary evidence to show that Eka's overtime opportunities increased and continued to increase after Joseph left Brookdeale. (Simpson Dec. at ECF 1) Thus, the Court finds that Joseph's comments, coupled with her handling of Eka's shift assignments, are sufficient to create an issue of fact as to whether Eka's July 2009 suspension and the limitation on his overtime opportunities occurred under circumstances giving rise to inference of discrimination.[22]

---

to a single incident, that were made contemporaneously in relation to the time period when he was subjected to an adverse employment action. *Id.* at 315.

[22] Although this conclusion means that the alleged shift denials are doing double-duty, *i.e.*, serving both as an adverse action and as proof of discriminatory animus with respect to Plaintiff's 2009 suspension, the Court is unaware of any case law that prohibits such a result.

ii.    Failure to Investigate

Plaintiff alleges that Brookdale's alleged failure to investigate Eka's oral and written complaints to Brookdale management give rise to an inference of discrimination. *See Mandell v. Cty. of Suffolk*, 316 F.3d 368 (2d Cir. 2003) (holding that an employer's failure to investigate allegations of a discriminatory atmosphere in the workplace may raise an inference of discrimination). However, Plaintiff's failure to investigate argument fails because (1) Plaintiff never clearly communicated his concerns about national origin discrimination to Brookdale management; (2) Brookdale nonetheless conducted an investigation into his complaints; and (3) the cases cited by Plaintiff, in which such an inference was found, are plainly inapposite.

Although Eka filed several complaints with Brookdale complaining about Joseph that referenced "discrimination" and/or "retaliation," he never mentioned his national origin or claim that Joseph was discriminating or retaliating against him on the basis of his national origin. (*See* Pl. Ex. 7, 8, 12, 13.) Rather, most of Eka's complaints characterized Joseph's staffing decisions as "management incompetency" (Pl. Ex. 13) and a "waste of [corporate] funds" (Pl. Ex. 7, 12), and noted the amount of money Brookdale had lost as a result of these decisions (Pl. Ex. 7, 8). For example, Eka's July 21, 2009 Complaint (Pl. Ex. 7), entitled, "Deliberate Waste of Hospital Funds," opens and closes with the following:

> This is to bring your attention to some of the way funds have been wasted in Brookdale Hospital . . . . It is also to report the activities of nurse manager Evelyn Joseph of the 8th Pediatric psychiatric floor. Being a management graduate, I know what it takes to hire[,] train, and retain staff. Mrs Joseph makes this impossible because of her style of leadership. To me, I think Brookdale Hospital have [sic] actually succeeded in wasting funds by training several nurses and losing them to competitors all because of Mrs. Joseph. . . . Mrs. Joseph favors some staff over some. [sic]

* * *

Brookdale lost more than $200 because of Mrs. Joseph's lack of management and financial skill. . . . Who knows the reason? Maybe one of her favorite was working there as overtime.

Notwithstanding the vagueness of Plaintiff's complaints, Brookdale did conduct an investigation into Plaintiff's September 17, 2009 complaint, which referenced "Retaliation or Discrimination or Nepotism/Favoritism" (Pl. Ex. 8 at ECF 2), and stated, in part, "I have complained about [full-time staff receiving extra shifts and thus getting overtime pay] and I think I am being deliberately retaliated or discriminated against, or nepotism is at work . . . .Why am I being either retaliated, or discriminated against? I never thought I did anything wrong by blowing the whistle on everything (negative) going on." (*Id.* at ECF 2–3.) Cornet, Brookdale's Assistant Director of Labor Relations, and Lee, Director of Human Resources, met with Eka to discuss his complaint. (Pl. Ex. 10; Pl. Ex. 13 at ECF 3.) In addition, Brookdale also interviewed Joseph.[23] (Pl. Ex. 5 at 229–31.) Thus, Plaintiff has not established a genuine dispute as to whether Brookdale failed to investigate Eka's complaints, so as to raise an inference of discrimination with respect to either the alleged denial of shifts or Plaintiff's suspension.

The cases that Plaintiff cites in support of his argument are all distinguishable. Plaintiff cites to *Snell v. Suffolk County*, 782 F.2d 1094 (2d Cir. 1986), in which the Second Circuit held that "once an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it." 782 F.2d at 1104. However, in *Snell*, sixteen black and Hispanic correction officers testified to a "racially combative atmosphere" at the prison where they worked that involved the officers being subjected to racial epithets, "racially derogatory 'literature' posted on bulletin boards and walls," "'study guides' for minority officers

---

[23] Again, the record does not indicate when Joseph was interviewed and who exactly interviewed her.

. . . [that included] puzzles commonly found in children's books," a "questionnaire for black officers containing virtually every conceivable racially offensive cliche," an offensive picture of a "black man with a noose around his neck," and about being "denied access by white guards to a locked bathroom." *Id.* at 1098. Under those circumstances, the Second Circuit found that the district court properly found the defendant employer liable for failing to correct its racially hostile work atmosphere in spite of the officers' complaints. *Id.* at 1097–98. By contrast, even crediting Plaintiff's complaints here, they do not come close to the volume, severity, or specificity of complaints made by the minority officers in *Snell*, and do not, as in *Snell*, support a finding that there existed a "racially combative atmosphere" at Brookdale of which the administration was aware. Indeed, as discussed *infra*, not once did Eka state in his numerous letters to Brookdale management—except for his oral complaint and the May 2009 complaint that no one seems to have a copy of—that Joseph made an offensive comment about Nigerians. Furthermore, as discussed *infra*—except for Plaintiff's EEOC Charge and an undated January 2014 letter complaining about a different supervisor (Robinson)—none of Eka's complaints to Brookdale mention his national origin or that of any other employees.[24]

Plaintiff also cites to *Sassaman v. Gamache*, 566 F.3d 307 (2d Cir. 2009). In *Sassaman*, the Second Circuit considered "whether a reasonable jury could infer discrimination based on sex stereotyping in light of the [plaintiff's] evidence that his supervisor believed that men had a propensity to commit sexual harassment and defendant's arguable failure to investigate properly the charges of sexual harassment lodged *against* the [plaintiff]." *Id.* at 309. The court held that

---

[24] It also bears note that, as discussed, *Snell* did not involve the question of whether an employer's failure to investigate complaints of discrimination constituted a circumstance giving rise to an inference of discrimination with respect to a particular employment action taken against the employee. Rather, *Snell* stands for the proposition that an employer has a duty to intervene when it is aware of a racially hostile work environment. 782 F.2d at 1104.

the defendant's decision not to investigate properly the charge "that led directly to [the plaintiff's] forced resignation" gave rise to an inference of discriminatory intent. *Id.* at 312. Again, here, none of Eka's complaints clearly conveyed to Brookdale the nature of Eka's purported discrimination or retaliation claims, *i.e.,* that he was alleging national origin discrimination, such that any alleged failure to investigate should give rise to an inference of discrimination.

Lastly, Plaintiff cites *Mandell v. Cty. of Suffolk*, 316 F.3d 368 (2d Cir. 2003). In *Mandell*, the Second Circuit found that "[a]nti-Semitic comments and behavior have traditionally been part of the culture of the Suffolk County Police Department." 316 F.3d at 378. The Circuit panel found that the plaintiff had sufficiently shown that the department's leadership tolerated anti-Semitic attitudes, based on the affidavit of the Suffolk County police chaplain, who had worked with the department for *twenty years*, stating that the chaplain had communicated his concern about anti-Semitic attitudes to *every* commissioner, and that every one of them acknowledged the problem but failed to take any action. *Id.* at 379. Here, unlike what was described in *Mandell*, there is no evidence of a "culture" of anti-Nigerian sentiment at Brookdale that was ignored by its management. Therefore, *Mandell* is materially distinguishable from this case, and does not support Plaintiff's argument about discrimination being inferred from Brookdale's alleged failure to investigate Eka's claims.

Accordingly, the Court finds that Plaintiff has failed to sufficiently demonstrate that Brookdale failed to investigate his claims of discrimination and retaliation or that any inference of discrimination based on a failure to investigate can be found in this case.

### iii.  Disparate Treatment

Eka asserts that he was treated less favorably in numerous ways than similarly situated non-Nigerian employees and that thus an inference of discrimination is raised. *See Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (an inference of discrimination can be raised by

"showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group.'" (quoting *Mandell*, 316 F.3d at 379). In addition to his claim that Joseph denied Eka extra shifts and overtime, Plaintiff asserts, as another form of disparate treatment, that Joseph selectively enforced the hospital's rules against him, including his suspension. Eka testified that two non-Nigerian co-workers, Sabine Vaillant ("Vaillant") and Laurenceau (first name unknown), who refused to float in spite of Joseph's instructions were never reprimanded. (Pl. 56.1 ¶ 42; Eka Pl. at 338, 353–55.) He also testified that Laurenceau's refusal to float resulted in a screaming match between Laurenceau and Joseph. (Eka Pl. at 354–55.) Additionally, Plaintiff argues that another non-Nigerian Psych Tech with a history of being disruptive was suspended only once. (Pl. Opp. at 18 (Pl. Ex. 17 at 55, 87, 99, 113, 117–21.)).

However, much of this "evidence" are nothing more than Eka's own conclusory statements, which cannot give rise to an inference of discrimination. *See Gill v. Mount Sinai Hosp.*, 160 F. App'x 43, 44 (2d Cir. 2005) (summary order) ("[Plaintiff] failed to establish a genuine issue of material fact as to whether she could prove a *prima facie* case of racial discrimination. She provided no evidence . . . other than her own conclusory allegations, which themselves do not give rise to an inference of discrimination"); *Ibok v. Secuirties Industry Automation Corp.*, 369 F. App'x 210 (2d Cir. 2010) (summary order) (affirming district court's dismissal of plaintiff's Title VII racial discrimination claim where the district court found that plaintiff only provided conclusory statements in support of her assertion that other similarly situated employees were accorded preferential treatment). Indeed, Eka's testimony on this issue is complete hearsay, which would be inadmissible at trial. Thus, Plaintiff may not argue at trial that Joseph's selective enforcement of the hospital's rules against him, including his 2009 suspension, demonstrates disparate treatment or gives rise to an inference of discrimination.

2.    Step 2: Non-Discriminatory Justification

Because Plaintiff has established a *prima facie* case of discrimination as to the denial of extra shifts and overtime and as to his 2009 suspension, a presumption arises that Defendant unlawfully discriminated against him. *Mandell*, 316 F.3d at, 380 (citing *Burdine*, 450 U.S. at 254). To rebut this presumption, "the employer must come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions toward plaintiff." *Id.* (citing *Burdine*, 450 U.S. at 254).

With respect to Eka's 2009 suspension, Brookdale provides sufficient evidence of legitimate reasons for his suspension.  Defendant has presented evidence that Eka was suspended because he cursed at Joseph and refused to work at a particular unit as directed by Joseph.  (Def. Ex. 34; Eka Def. at 120, 144; Def. 56.1 ¶ 56.)  The Court finds that Brookdale has met its burden to proffer evidence showing that it had legitimate, nondiscriminatory reasons for suspending Eka. *See Hicks,* 509 U.S. at 509 (noting that defendant's evidence of non-discriminatory justification is not subject to attack of a "credibility assessment"); *see also Burdine,* 450 U.S. at 254, ("[D]efendant need not persuade the court that it was actually motivated by the proffered reasons.").

However, because Defendant does not provide any legitimate explanation as to denying Plaintiff's opportunity to get extra shifts, Defendant has not met its burden as to that aspect of Plaintiff's discrimination claim, and thus summary judgment is denied as to Plaintiff's discrimination claim on the basis that he was denied extra shifts and overtime.[25]

---

[25] At most, Defendant addresses Plaintiff's claim that Joseph denied him extra shifts by denying that it occurred at all and noting that "prior to Joseph's departure from Brookdale, Eka was on track to work more shifts in 2010 than he did in 2009." (*See* Def. Reply at 2.)  But that evidence would not preclude a jury from finding discriminatory animus by Joseph based on the overall trend showing an increase in Eka's shifts following Joseph's departure.  Similarly, that Eka might have occasionally refused shifts he was offered or might not have been available to

3.    <u>Step 3: Pretext</u>

Because Brookdale has met its burden only as to Plaintiff's discrimination claim relating to the 2009 suspension, the Court only examines whether Plaintiff has demonstrated that Defendant's purported reasoning for the suspension was mere pretext for national-origin discrimination.[26] Here, for the reasons explained below, the Court concludes that a rational jury, viewing the disputed evidence in Eka's favor, could not find that his 2009 suspension was the result of discrimination based on national origin.

At the pretext stage, a plaintiff must provide more than conclusory allegations to defeat a motion for summary judgment. *See Delaney v. Bank of America Corp.,* 766 F.3d 163, 170 (2d Cir. 2014) (citing *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 101 (2d Cir.2010)); *see also Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (explaining that at the pretext stage, a plaintiff's allegation of discrimination must be "increasingly sharpened and focused"). Plaintiff must offer evidence that Defendant's purported reason is a mere pretext for unlawful discrimination. *Weinstock*, 224 F.3d at 42. "[T]o defeat summary judgment . . . the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." *Kirkland*, 760 F.3d at 225 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138

_____

work shifts offered to him does not preclude a jury from inferring discriminatory intent based on Plaintiff's shift-trend evidence, and is an issue of fact for the jury to decide. (*Compare* Def. 56.1 ¶ 78, 79 *with* Pl. 56. 1 ¶ 78, 79). *See Kirkland*, 760 F.3d at 227.

[26] Even assuming that Defendant had provided a legitimate reason for denying Eka extra shifts and overtime, the record indicates that there are disputed issues of material fact as to whether the denials were due to discrimination. Again, although the number of shifts Eka received the year after Joseph left may not have increased by the 35 percent claimed by Eka, it still increased and continued to increase thereafter.

(2d Cir. 2003) (alterations in original)); *see also Weinstock*, 224 F.3d at 42 ("[P]laintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false[.]") citing *Van Zant v. KLM Royal Dutch* Airlines, 80 F.3d 708, 714 (2d Cir. 1996)).

"A showing that similarly situated employees belonging to a different [protected] group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). An employee must establish that he was "similarly situated to [his] co-employees [in that] they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.' . . . [T]he comparator must be similarly situated to the plaintiff 'in all material respects.'" *Ruiz*, 609 F.3d at 493–94 (quoting *Graham v. long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) and *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

Here, the Court has found that Plaintiff's evidence regarding Joseph's comments about Nigerians, coupled with her allegedly discriminatory denials of extra shifts and overtime, are sufficient to establish the inference-of-discrimination element of Plaintiff's *prima facie* discrimination case. The question at this stage, however, is whether this and/or other evidence proffered by Plaintiff is sufficient to meet the more demanding burden of proving a triable issue of fact as to whether Brookdale's proffered reasons for Eka's 2009 suspension are pretext and whether the real reason for the suspension was national origin discrimination. As previously discussed, Joseph's comments about Nigerians, in themselves, were too remote in the time to support an inference that Eka's suspension was motivated by national origin discrimination, but the combination of these comments and the intervening course of Joseph's allegedly disparate

treatment of Eka with respect to shift assignments satisfied the minimal showing needed to establish a *prima facie* case of discrimination. This showing, however, is not enough to show that Defendant's decision to suspend Eka in July 2009 was pretext for discrimination, in the face of the legitimate, non-discriminatory reason that Defendant offers for the suspension decision, namely, to punish Eka's insubordination for refusing a direct order of his supervisor. Thus, at this stage, given the absence of any direct evidence of discriminatory intent, Plaintiff must make a stronger showing of disparate treatment in order for his discrimination claim with respect to the 2009 suspension to survive.

In his opposition to summary judgment, Plaintiff argues that the discriminatory motive behind his suspension is demonstrated by a history of Joseph's selective enforcement of the hospital's rules against him, as compared to non-Nigerian employees. Eka provides the following examples of Joseph's selective enforcement of the rules: reprimanding Plaintiff for drinking water during his shift, when other employees including those supervised by Joseph routinely drank water on their shifts without getting into trouble; scolding Plaintiff for discussing with co-workers issues relevant to patient safety during shift changes; and disciplining Plaintiff for lateness and attendance, when a non-Nigerian employee who was chronically late was never disciplined. (Eka Pl. at pp. 82–87, 89, 91, 96, 101, 102, 272, 337, 338, 353–55 and Pl. Ex. 17 at 62, 110, 126, 129.) However, notwithstanding these assertions, Plaintiff has not raised a genuine issue of material fact regarding disparate treatment for several reasons.

Plaintiff's allegations are solely based on his own conclusory deposition testimony, which, in many instances, fails to identify a particular co-worker who purportedly received preferential treatment, and thus fails to properly identify a comparator. Even in those few instances when a particular co-worker is identified, the record does not demonstrate that Plaintiff and the co-worker

were similarly situated in "all material respects." *See Graham*, 230 F.3d at 40; *see also Goldman v. Admin for Children's Servs.*, No. 04 Civ. 7890, 2007 WL 1552397, at *7 (S.D.NY. May 29, 2007) ("'[S]weeping allegations,' in which plaintiff cannot even identify, and presents no evidence of, the race or national origin of alleged comparators, cannot satisfy the similarly situated test." (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997))).

For example, although Plaintiff argues that he was the only one who was reprimanded for drinking water during his shift, there is absolutely no support for this in the record. Besides testifying that Joseph instructed him not to drink water while in the patient care area and to step out if he is thirsty, Eka never testified about any other employee who drank water in the patient care area, or anywhere else for that matter, and was not similarly instructed. (*See* Eka Pl. at 88, 101–02.) "Even in the discrimination context, [ ] a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

Plaintiff also testified that he was reprimanded for giving an oral report to his co-worker, Garnice Barnett, who is Haitian, about a patient and that "[a]ll others were not reprimanded" for doing the same thing. (Eka Pl. at 82.) However, the actual circumstances of this event, as testified to by Eka himself, are insufficient to support his claim of being singled out for discipline on this occasion. Regarding that incident, Eka testified:

> Q: When Ms. Joseph had this conversation with you about not talking, was that privately to you or was that with Garnice Barnett present?
>
> A: Garnice was present.

(Eka Pl. at 97.)[27] While Plaintiff argues that only he, and not Barnett, was reprimanded by Joseph, that claim is based on sheer speculation, given that he and Barnett were clearly together during the "reprimand", and there is no evidence indicating that Joseph addressed only Eka.[28]

Plaintiff also asserts that Josine St. Felix Bazile ("Bazile"), a Haitian Psych Tech with a history of disruptive behavior, was suspended only once. (Pl. Opp. at 18.) Plaintiff contends that the comparatively laxer treatment of Bazile demonstrates that Defendant's stated reason for suspending Eka is a pretext for discrimination. This argument is wholly unpersuasive. First, the record does not support Plaintiff's contention about the severity of Bazile's history of disruptive behavior, *i.e.*, that Bazile was "criticized almost every year for being disruptive during her more than fifteen (15) years at Brookdale." (Pl. Opp. at 18 (citing to Pl. Ex. 17 at 55, 87, 99, 113, 117–21.)). A review of the record to which Plaintiff cites merely shows that (a) in one of Bazile's performance reviews, she was told to improve her interpersonal relationships with co-workers, (b) on one occasion, Metelus communicated to Bazile her (Metelus's) concern about Bazile's disruptive behavior at work, (c) Bazile was told to make improvements in the areas of punctuality, dress code, and professional manner, and (d) there was an (undescribed) incident in 2009 that led to Bazile's suspension.[29] (Pl. Ex. 17 at 55, 87, 99, 113, 117; Def. Ex. 55.) This evidence is

---

[27] In challenging Plaintiff's claim, Defendant points to a complaint letter that Barnett filed with the hospital before resigning, in which she complains about being reprimanded by Joseph for this incident. (*See* Def. 56.1 ¶¶ 67–68; Def. Ex. 25.) Although this letter is inadmissible hearsay, the Court need not rely on it in finding that Plaintiff has failed to show disparate treatment based on this reprimand incident.

[28] Plaintiff's assertion that, "[t]he person Eka was speaking to[, *i.e.*, Barnett,] was not admonished for providing a report about the patients at the shift change. The non-Nigerian employee was admonished *for speaking to Eka*" (Pl. 56.1 ¶ 43 (citing to Eka Pl. at 96)), aside from again being unsupported speculation, is nonsensical.

[29] *See Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what

34

insufficient to show that Bazile is a proper comparator with respect to the severity of conduct that resulted in their respective suspensions. Second, Plaintiff downplays key facts that demonstrate that Bazile and Eka were treated in a consistent manner. While Plaintiff argues that Bazile was only suspended after she made another Haitian employee cry, the record indicates that Bazile was suspended after she "told [another employee] to shut her mouth." (Pl. Ex. 17 at 117.) Rather than demonstrating that Plaintiff was treated unfairly compared to other non-Nigerian employees, it tends to show that Bazile was actually disciplined more severely than Eka, given that Bazile was only alleged to have spoken inappropriately to another employee, and not to her supervisor, as Eka was found to have done.[30]

Comparing himself to Bazile again, Plaintiff alleges that he was subject to disparate treatment and "disciplined" for lateness and attendance when Bazile, who was chronically late, was never disciplined. (Pl. Opp. at 17.) However, Plaintiff does not explain how he was "disciplined" for lateness and attendance problems. At most, the parties have pointed out evidence that Eka received verbal and written warnings about his attendance and lack of punctuality. (Def. 56.1 ¶ 39.) Neither does he provide evidence in support of his conclusory statement that Bazile was "chronically late", but insulated from any reprimand. (Pl. Ex. 17 at 62, 110, 126, 129.)[31] The

---

the parties fail to point out." (quotations and citations omitted)); *see also 24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39, 46 (2d Cir. 2005).

[30] While the Court need not address Defendant's argument that Bazile is not a true comparator because she was supervised by Metelus, the Court rejects that argument in light of the Second Circuit's holding in *McGuiness v. Lincoln Hall*, 263 F.3d 49, 53–54 (2d Cir. 2001) ("The magistrate judge interpreted *Shumway* to mean that another employee cannot be similarly situated to a plaintiff unless the other employee had the same supervisor, worked under the same standards, and engaged in the same conduct. This was a misreading of *Shumway*.").

[31] Bazile merely testified that she did not remember whether she was given any written or verbal warning concerning punctuality at any time before August 2003. (Pl. Ex. 17 at 62.) In fact, Bazile also testified that she *had* received a verbal warning for her continued punctuality issues. (*Id.* at 110, 126.) Moreover, it is clear from the deposition transcript that there was a significant

record indicates that Bazile was given warnings for being late just as Eka was, and Plaintiff has not demonstrated that the number of times he was late was less compared to the number of times Bazile was late.

Plaintiff also testified that two non-Nigerian employees, Vaillant and Laurenceau, had refused to float, but were never reprimanded. (Pl. 56.1 ¶ 42; Eka Pl. at 338, 353-55.) He further testified that Laurenceau's refusal resulted in a loud argument with Joseph. (Eka Pl. at 354.) While Plaintiff need not show that other employees who were not suspended committed acts identical to his conduct, he must demonstrate that "the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40. Again, Plaintiff fails to establish that Vaillant's or Laurenceau's conduct was comparable to his. Even though Plaintiff testified about Laurenceau's "loud [argument] back and forth [with Joseph]," Plaintiff ultimately admitted that he had no idea what they were arguing about because "they were mostly speaking in Creole . . . ." (Eka Pl. at 121.)[32]

---

language barrier, making it unclear as to what Bazile meant when she answered many of the questions. The following excerpt is one example:

> Q. This time-and-attendance record [indicates] that you were late on multiple occasions, right?
> A. Yes.
> Q. And do you disagree that you were late on any of these occasions?
> A. Sure, yes.
> Q. You don't think you were late?
> A. Yes, I'm late.
> Q. Oh, you were late?
> A. [Y]es.

(*Id.* at 103–04.)

[32] When Plaintiff was asked how he knew that Laurenceau had refused to float, Plaintiff responded, "Everybody was saying it." (Eka Pl. at 355.) Plaintiff's reliance on what "everybody was saying" makes his testimony about Laurenceau having refused to float and getting into an argument over it inadmissible. Furthermore, there is no way for Plaintiff to offer firsthand

Plaintiff also asserts that he was the only employee whom Joseph directed by phone to float to another unit, and that Joseph did not have the authority to instruct Eka over the phone in the first place. (Pl. Opp. at 17–18.)[33]  Again, however, Plaintiff relies solely on his conclusory testimony for this proposition and has not identified any official policy by Brookdale that does not allow a supervisor to give assignment instructions over the phone. (*See id.*)  Moreover, "a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact." *Fleming v. MaxMara USA,* 644 F. Supp. 2d 247, 266 (E.D.N.Y.2009), *aff'd,* 371 F. App'x. 115, 117–18 (2d Cir.2010); *see also Martinez v. Conn. State Library,* 817 F. Supp. 2d 28, 47 (D. Conn.2011) ("[T]he fact that [plaintiff] disagreed with Defendant's conclusion that her behavior during the bathroom incident was inappropriate and violated the Workplace Violence Policy is alone insufficient to create a triable issue of fact.").  Thus, despite the fact that Plaintiff disputes Joseph's authority to give a float order telephonically and Brookdale's decision to discipline Eka for refusing that order, that disagreement does not create a triable issue of fact as to whether Defendant acted with a discriminatory purpose in suspending Plaintiff.

For the foregoing reasons, the Court finds that Plaintiff has not met his burden under the *McDonell Douglas* framework as to his discrimination claim relating to the 2009 suspension. Accordingly, the court grants Defendant's summary judgment motion as to Plaintiff's Title VII

_____

knowledge about what was said during the argument, including, for example, whether Laurenceau cursed at Joseph.

[33] Plaintiff argues that his "suspension was a product of disparate treatment.  This is obvious . . . [because by] giving Plaintiff a work location assignment while she was not on duty, Joseph violated Brookdale's well-established practice and procedure.  No evidence suggests that Joseph ever assigned any other employee to float when she was not at work." (Dkt. 39 at 17.)  Even assuming that no other Brookdale employee has ever been telephonically directed to float by their supervisors, the fact that it happened once to Eka is simply insufficient to show disparate treatment.

and NYSHRL discrimination claim based on his suspension, but denies it with respect to Plaintiff's discrimination claim based on denial of extra shifts and overtime.

**B.    Hostile Work Environment Pursuant to Title VII and the NYSHRL**

Eka alleges that Brookdale subjected him to a hostile work environment in violation of Title VII and the NYSHRL.  Hostile work environment claims brought under either statute are reviewed under the same standard.  *Tolbert*, 790 F.3d at 439.  "To establish a prima facie case of hostile work environment, a plaintiff must show that the discriminatory harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and 'that a specific basis exists for imputing' the objectionable conduct to the employer."  *Id.* (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)).  "It is axiomatic that the plaintiff also must show that hostile conduct occurred because of a protected characteristic."  *Id.*  When determining whether the plaintiff has met his burden to show that the conduct at issue was "sufficiently severe or pervasive," the Court examines the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance."  *Rivera v. Rochester Genessee Regional Transp. Auth.,* 743 F.3d 11, 20 (2d Cir. 2014).

Eka has failed to identify sufficient material facts demonstrating that his work environment was objectively hostile and abusive.  His claim is based on the same facts on which he bases his discrimination claim, namely, that Joseph (1) commented about Eka's national origin; (2) denied Eka additional shifts and overtime; (3) "prevented Eka from drinking water"; (4) "scolded him for safeguarding patients by communicating with colleagues at shift changes"; (5) assigned him to undesirable work; (6) selectively enforced rules; and (7) deviated from well-established practices and procedures for the purpose of suspending Eka.  He further alleges that Brookdale's failure to

38

conduct an investigation in spite of Eka's complaints created a hostile work environment. (Pl. Opp. at 21.)

However, these incidents do not add up to a hostile work environment because they were, at most, episodic events. *See Das v. Consolidated School Dist. of New Britain,* 369 F. App'x. 186, 190 (2d Cir. 2010) (summary order) (noting that the incidents at issue must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive" (quoting *Alfano,* 294 F.3d at 374)); *see also Alfano,* 294 F.3d at 379 ("There is no fixed number of incidents that a plaintiff must endure . . . we view the circumstances in their totality, examining the nature, severity, and frequency of the conduct."). Joseph's comment about Nigerians and scolding Eka for speaking to Barnett during a shift change were one-time events that do not give rise to a hostile work environment claim (Def. 56. 1 ¶ 41, 43, 101). *See Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."). To the extent Plaintiff's reference to "deviation from well-established practices and procedures" relates to Joseph instructing Eka by phone to work at a different unit, this also occurred only once over the four-year period that Eka was supervised by Joseph. Moreover, as noted earlier, by Plaintiff's own admission, Joseph did not prevent Eka from drinking water, but merely instructed him not to drink water in the patient care area. (*See* Eka Pl. at 88, 101–02.) Being required to leave the room to drink water certainly does not rise to the level of what courts have recognized as hostile work environment, especially where there is no evidence suggesting that this was not a standard procedure for all Brookdale employees or one justified by the demands of the hospital environment. *See Levitant v. City of New York Human Resources Admin.*, 625 F. Supp. 2d 85, (E.D.N.Y. 2008) (finding that telling employee he can "go and drink water from the toilet," *inter*

*alia*, created a hostile work environment).  Although Eka alleges that he was assigned "undesirable work," the real issue, as he admitted, was that he simply did not like working in the emergency unit.  (Eka Pl. at 88–89.)[34]  A supervisor's failure to cater to an employee's preference does not give rise to a hostile work environment claim, especially when there is no evidence that being assigned to work in the less preferred unit resulted in material alterations of the employee's job responsibilities.  *Accord Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 213 (E.D.N.Y. 2014) (finding that assignment to undesirable units was not an adverse action).

Nevertheless, because Plaintiff's Title VII and NYSHRL discrimination claims as to denial of extra and overtime shifts survives summary judgment and are based on the same allegations, the more prudent course is not to dismiss the challenged claim.  *See Bacchus v. New York Dep't of Educ.*, 137 F. Supp. 3d 214, 241–242 (E.D.N.Y. 2015); *see also Thibodeaux v. Travco Ins. Co.*, 13–cv–5599, 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").[35]  Therefore, the Court denies

---

[34] Q. When you said you were given less desirable assignments, what were you referring to?
A. Meaning I have my preference and other people had their preference.  When they refused an assignment, they sent them to where they want.  But my case was different.

\*       \*       \*

Q. [W]hat were your preferences during this period of time?
A. You know, like some people prefer to go to the emergency room and some people prefer to stay on the floor . . . .I prefer to stay on the floor.

[35] The Court also notes that Plaintiff has put forth sufficient evidence to create an issue of fact as to whether a "specific basis exists for imputing the objectionable conduct[, *i.e.*, the shift denials,] to [Brookdale]", *Tolbert*, 790 F.3d at 439 (internal quotation marks omitted).  On July 21, 2009, Eka filed a written complaint to Brookdale's President/Chief Executive Officer,

Defendant's motion for summary judgment as to Plaintiff's hostile work environment claim only as to Eka's allegations that he was denied overtime opportunities.

### C.    Retaliation Claims Pursuant to Title VII and the NYSHRL

Plaintiff also claims that Joseph retaliated against him for complaining about her comments by suspending him in 2009, and that Brookdale retaliated against him for filing his complaints by refusing to hire him for other positions at Brookdale for which he had applied.  Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of its employees . . . because [the employee] has opposed any practice" made unlawful by Title VII or because the employee has "made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding.  42 U.S.C. § 2000e–3(a).  The Court applies the *McDonell Douglas* burden-shifting framework to Plaintiff's retaliation claims under both Title VII and the NYSHRL.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).

"To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal

---

Executive Vice President/Chief Operating Officer, and Executive Vice President/Chief Financial Officer, in which he complained, *inter alia*, about Joseph favoring some staff members and awarding shifts to Eka's co-workers but not to him, and stated that "[t]his is a case of discrimination."  (Pl. Ex. 7 at ECF 3.)  Again, on September 17, 2009, Plaintiff filed a complaint to the same officials, entitled "Retaliation or Discrimination or Nepotism/Favoritism."  (Pl. Ex. 8 at ECF 2.)  There, he complained that a shift available on September 10, 2009, was given to a full-time staff member instead of him and further stated that, "I have complained about [full-time staff receiving extra shifts and thus getting overtime pay] and I think I am being deliberately retaliated or discriminated against, or nepotism is at work . . . .Why am I being either retaliated, or discriminated against?  I never thought I did anything wrong by blowing the whistle on everything (negative) going on."  (*Id*. at ECF 2–3.)  Eka's September 17, 2009 letter was specifically discussed at his meeting with Cornet and Lee.  (Pl. Ex. 10; Pl. Ex. 13 at ECF 3.)  This and other evidence provides a sufficient basis on which to impute the complained-of shift denials by Joseph to Brookdale.

connection between the protected activity and the adverse employment action.'" *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). Once a *prima facie* case of retaliation is established, there is a "'presumption of retaliation,' which the [employer] may rebut by 'articulating a legitimate, non-retaliatory reason for the adverse employment action.' If the [employer] provides such an explanation, 'the presumption of retaliation dissipates,' and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) and *Univ. of Tex. SW. Med. Ctr. v. Nassar*, ---U.S.---, 133 S.Ct. 2517, 2528 (2013)).

The parties dispute the first, second, and fourth elements as to both Plaintiff's retaliation claim relating to the 2009 suspension and relating to Brookdale's failure to hire Eka for other positions.

### 1. Step 1: *Prima Facie* Case

#### a. Protected Activity

To establish that Eka engaged in protected activity, he "need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Summa*, 708 F.3d at 126 (citation and internal quotation marks omitted).

While Plaintiff asserts that *all* complaint letters he filed with Brookdale constitute protected activities, as discussed *supra*, the evidence does not support this argument. Nonetheless, the Court finds that Plaintiff has engaged in protected activities by filing three complaints: the 2008 oral complaint, the May 2009 written complaint, and the January 2010 EEOC Charge.

i.    Plaintiff's Complaints Prior to His 2009 Suspension

Defendant argues that Plaintiff's complaints filed with Brookdale were not protected activities because they only complained about Joseph's alleged waste of hospital funds and management.  However, in his declaration, Eka alleges that he filed, with Grazette, an oral complaint in 2008 and a written complaint in May 2009, both of which specifically mentioned Joseph's comments about Eka's national origin.  (Eka Dec. ¶ 6, 7.)  Informal complaints, such as those Eka alleges to have made, are considered protected activities.  *See Littlejohn*, 795 F.3d at 317–18 (noting informal protests of discriminatory employment practices, including complaints to management, are protected activities under Title VII).

Although Defendant contends that Eka's declaration cannot create a genuine issue of fact as it is contrary to his deposition testimony and cites to "Pl. Dep. at 80–81" (*see* Def. Reply at 7), the Court does not find anything contradictory between that portion of the deposition testimony and his declaration.  Plaintiff testified that when he told Grazette about Joseph's comments, Grazette spoke nicely about Joseph and that Plaintiff could not quote what Grazette said verbatim because it was a long time ago.  (Eka Def. at 80.)  When Eka was asked whether he remembered what his May 2009 complaint stated, he testified that the complaint included what he previously told Grazette.  (*Id.*)  Viewing the evidence in the light most favorable to Eka, a reasonable jury could find that Eka, in fact, filed two complaints specifically mentioning discrimination based on national origin, and thus had engaged in protected activity prior to his July 2009 suspension.  *See Varno v. Canfield*, 664 F. App'x 63, 66 (2d Cir. 2016) (summary order) (finding district court erred by concluding that plaintiff failed to establish a *prima facie* case of retaliation because she did not prove the "protected activity" element where plaintiff testified that she made an oral complaint to a human resources employee prior to termination).

ii.    Plaintiff's Other Complaints

Among the numerous complaints Eka filed after his 2009 suspension, only his EEOC

Charge, filed on January 22, 2010, is considered protected activity relevant to his retaliation claim

because he specifically alleged discrimination based on national origin and mentioned Joseph's

comments about Nigerians (Pl. Ex. 9 at 3, 4).[36]

The other post–July 2009 complaints Eka filed with Brookdale, all filed between 2012 and

2015, failed to mention discrimination based on national origin.[37]  In spite of using terms such as

"favoritism" and "retaliation," the letters focused on how the decisions by his supervisors,

Robinson and Margaret O'Rourke, to assign extra shifts to his co-worker, Berkley (first name

unknown), had economic ramifications for Brookdale.  (See Def. Exs. 40, 41, 42, 44.)  In his

February 15, 2012 complaint, Eka merely complained about the patient-to-staff ratio and stated,

"This letter is to inform you about unsafe staffing situations . . . ."  (Def. Ex. 52.)  In his January

31, 2014 complaint, entitled "Favoritism, Retaliation & Waste," he stated, "Approving Ms.

Berkley is morally and ethically wrong. I was taught in business school that the goal of every

---

[36] Eka's January 2014 letter addressed to Susan Deitz, which is only dated by the month and year (Def. Ex. 39), specifically complained about Nurse Manager Robinson, stating that a "special group of staff members" are catered to and that "they are from the same country as [Robinson]."  (Def. Ex. 39 at ECF 127.)  However, Plaintiff has never alleged that he was discriminated or retaliated against by Robinson, and, in this case, asserts that facts involving Robinson are irrelevant.  (See Pl. 56.1 ¶ 9 ("[Def. 56.1 ¶ 9:] Robinson supervised from mid-2010 until 2014.  (Pl. Dep. at 9-10).  Response: No response is required for this statement because it does not contain any facts that are material to the determination of Defendant's motion.").)  Thus, the Court does not consider Eka's January 2014 letter as evidence of Plaintiff's participation in "protected activity."  See Schwartz v. York College, No. 06–CV–6754, 2011 WL 3667740, at *11 n.11 (E.D.N.Y. Aug. 22, 2011) (not considering plaintiff's allegations because they were absent from his amended complaint).

[37] The Court does not consider the testimony of Brookdale's Senior Vice President of Human Resource, Brubaker, that she believed that Eka had made a "good faith" complaint to be evidence of whether Eka engaged in protected activity, because Brubaker did not identify which of Eka's numerous complaints she was referring to.  (See Pl. Ex. 5 at 209–10.)

44

business is to maximize profit by minimizing expense(s)." (Def. Ex. 40.) Notably, in this complaint, Plaintiff contradicts his claim in this case that he was singled out for discrimination or retaliation as the only Nigerian employee (Pl. Op. at 4): "Also, I am *not* the only one who has been retaliated against or a victim of favoritism." (Def. Ex. 40.) Therefore, the Court finds that Eka's complaints filed between 2012 and 2014 are too ambiguous to constitute protected activity, for purposes of his Title VII retaliation claim. *See Int'l Healthcare Exch.*, *Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity."); *Foster v. Humane Soc'y of Rochester & Monroe Cty, Inc.* 724 F. Supp. 2d 382, 394–95 (W.D.N.Y. 2010) (finding no protected activity by plaintiff where her complaint was about work-related problems outside the scope of Title VII); *see also Kelly*, *v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) (per curiam) (finding that even though plaintiff's complaint "repeatedly used the words 'discrimination' and 'harassment'", "there was nothing in her protests that could reasonably have led [the company] to understand that [gender discrimination] was the nature of her objections" (citation and quotation marks omitted)); *Clark v. Cache Valley Elec. Co.*, 573 F. App'x 693, 702 (10th Cir. 2014) (dismissing retaliation claim because "[a]lthough [plaintiff] included conclusory statements about 'discrimination' or a 'hostile work environment' in his complaints to his supervisors and human resources, and occasionally opined that [a supervisor] favored [plaintiff's female co-worker] over 'male' employees, nothing in those complaints illustrated a reasonable, good faith belief that [defendant] was engaged in gender discrimination.").

In sum, although most of the complaints Plaintiff has proffered as evidence do not constitute protected activity, because a plaintiff has a minimal burden in proving a *prima facie*

case, *see Gallo v. Prudential Residential Services, Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994), the Court finds that Plaintiff has established his participation in protected activity through the 2008 oral complaint, the May 2009 complaint, and the January 2010 EEOC Charge.

### iii. Knowledge

"As to the second element [of the *prima facie* case], implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Kelly*, 716 F.3d at 15. Plaintiff must show that Brookdale was aware of his 2010 EEOC Charge and either his 2008 oral complaint or May 2009 complaint. Defendant asserts that there is no evidence that Joseph or the hiring managers responsible for the jobs to which Eka applied were aware of Eka's complaints. However, "for purposes of a prima facie case, a plaintiff may rely on general corporate knowledge of [his] protected activity to establish the knowledge prong of the prima facie case." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (citation and quotation marks omitted); *see Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."). Thus, Eka need not specifically establish that Joseph or the hiring managers were aware of his complaints.

The Court finds that Eka has met the "knowledge" element because he alleged that his complaints about Joseph's comments were filed directly with Grazette, the Director of Nursing (Def. 56.1 ¶¶ 6, 8). Furthermore, Defendant had knowledge of Plaintiff's EEOC Charge because it received, from the EEOC, a Notice of Charge of Discrimination on September 24, 2012 (Def. Ex. 46) and a December 19, 2013 EEOC Determination letter, finding probable cause as to Eka's discrimination and retaliation allegations (Def. Ex. 47). *Accord Bowen-Hooks*, 13 F. Supp. 3d at

223 (presuming defendant's knowledge of plaintiff's EEOC charge "because the EEOC responds to charges of discrimination by investigating the incident with the employer").

iv.   Causation

"The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (citation and internal quotation marks omitted); *see also Summa*, 708 F.3d at 127–28. To find a causal link, "the temporal proximity between the protected activity and the adverse action must be very close." *Garrett v. Garden City Hotel, Inc.*, No. 05 CV 0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (citation and internal quotation marks omitted). Here, Plaintiff was suspended on July 6, 2009, two months after filing a written complaint with Grazette about Joseph's comments. *See Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir.2010) (finding five months is "not too long" to find a causal relationship for a retaliation claim); *but see also Williams v. City of N.Y.*, 11-CV-9679, 2012 WL 3245448, at *11 (S.D.N.Y. Aug. 8, 2012) ("The passage of even two or three months is sufficient to negate any inference of causation when no other basis to infer retaliation is alleged."); *Lopez v. City of N.Y.*, 14-CV-3285, 2016 WL 3129184, at *9 (E.D.N.Y. June 2, 2016) (stating that "courts in this circuit have consistently held that a time period of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation").

Furthermore, "[t]o the extent that decisionmaker knowledge is relevant in establishing causation, that knowledge may be satisfied by demonstrating that 'the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity *acts pursuant to encouragement by a superior* (who has knowledge) to disfavor the plaintiff.'" *Summa*, 708 f.3d at 127 (quoting *Henry v. Wyet Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010) (emphasis in

original)).  Although there is no direct evidence that Grazette told Joseph to suspend Eka, given that Joseph reported to Grazette, who did not take action in spite of Eka's two separate complaints about Joseph, a reasonable jury could conclude that Joseph suspended Eka with Grazette's encouragement.  Thus, Plaintiff has met his *prima facie* burden of establishing the causation element of his retaliation claim based on his suspension.

As to Eka's retaliation claim based on Brookdale's decisions not to hire Eka for other positions for which he applied, Plaintiff offers only his own unsubstantiated testimony that, after not receiving a position that he was "guaranteed" to get, he was told by the interviewer that while the interviewer "would [have] love[d] to hire [Eka]", his "hands [were] tied" because of Eka's previous complaints.  (Pl. Opp. at 25; Eka Pl. at 344-47.)  However, this "evidence" is plainly inadmissible hearsay, and cannot be used to create a triable issue of fact as to retaliatory intent. *Pitton v. New York City Dep't of Educ*, No. 15–CV–1235, 2015 WL 7776908, at *11 n.4 (E.D.N.Y. Dec. 1, 2015) (declining to consider evidence of non-party statements because plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment" and plaintiff had failed to make requisite "showing that admissible evidence will be available at trial").  Furthermore, even accepting Plaintiff's account on its face, the interviewer's comments plainly contain another layer of hearsay, *i.e.*, what the alleged interviewer was told by another unidentified Brookdale employee or manager about the reasons why Plaintiff was being denied the position.  While the Court has the discretion to consider inadmissible evidence that can, at least, be reduced to an admissible form, the Court would decline to do so here, not only because of the multiple layers of hearsay,

but because there is no indication that the alleged interviewer could be called upon to give such testimony at trial or that the interviewer would give such testimony.[38]

Furthermore, against this paucity of "evidence", Defendant has offered evidence showing that of the thirteen positions to which Eka applied but was not interviewed, one never had a vacancy (Def. 56.1 ¶ 118); three had been filled by the time he applied (*id.* ¶¶ 112, 113, 122); four of them were filled by other Brookdale employees with many years of relevant experience (*id.* ¶¶ 115, 119–21); two of them were not filled in 2014 due to budget constraints (*id.* ¶¶ 123–24); and the remaining three positions—Ambulatory Care Manager, Laboratories Administration – Office Manager, Building Services Supervisor – Housekeeping—were filled by individuals who, although not previously employed by Brookdale, had nine or more years of relevant experience. (*Id.* ¶¶ 114, 116, 117.)  In short, Plaintiff cannot establish that he would have been hired for any of the positions for which he applied.[39]

_____

[38] Defendant has also indicated that this interviewer had left Brookdale in July 2014. (Lorick Dec. ¶ 4.)

[39] In the context of his pretext argument—which the Court need not consider in light of its ruling on the lack of causation evidence—Plaintiff points to other evidence that arguably relates to causation: (1) that Brookdale's HR department only gave Plaintiff a single interview in spite of (a) Brookdale's policy to give hiring preference to current employees, and (b) Plaintiff's Master's in Business Administration and "an excellent performance record (with one exception)." However, neither of these facts demonstrates causation.  First, even assuming that Brookdale has a policy to hire from within, there is no evidence that interviewing Plaintiff only once is inconsistent with the policy.  (2) Although Plaintiff received his Master's in Business Administration in 2012 (Pl. Ex. 16), his belief about his own qualification does not give rise to an issue of fact as to whether he was retaliated against by not being hired for the positions to which he applied. *Accord Nguyen v. Dep't of Corr. & Cmty. Servs.*, 169 F. Supp. 3d 375, 390 (S.D.N.Y. 2016) ("Plaintiff may disagree with the determination that [the hired candidates] were best suited for the [ ] positions, but as a matter of law his subjective assessment cannot give rise to an inference of discrimination."); *see also Crews v. Trs. Of Columbia Univ. in City of N.Y.*, 452 F. Supp. 2d 504, 526 (S.D.N.Y. 2006) (addressing plaintiff's failure to promote claim and noting that "[a]lthough [plaintiff] may disagree with [defendant's] determination that [another candidate] was more qualified than he, courts are not permitted to second-guess the reasonableness of the employer's criteria for employment or the merits of its selection for the position").

Therefore, Plaintiff has failed to meet the *prima facie* burden of establishing the causation element of his retaliation claim based on Brookdale's failure to hire him for any of the other positions for which he applied.

*    *    *

Plaintiff has thus failed to establish a *prima facie* case of retaliation based on his suspension and Brookdale's failure to hire.

### 2.    Step 2: Non-Discriminatory Justification

Brookdale's explanation for suspending Eka, in the context of his discrimination claim, applies to his retaliation claim as well. Thus, the Court finds that Brookdale has met its burden to proffer a legitimate, non-retaliatory reason for suspending Eka.

### 3.    Step 3: Pretext

Because Brookdale has met its burden of production, now Eka has the burden of showing "that the unlawful retaliation[, *i.e.*, the 2009 suspension,] would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Kirkland*, 760 F.3d at 225 (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 835 (2d Cir. 2013)); *see also Ya-Chen Chen*, 805 F.3d at 70 (2d Cir. 2015). "There are two distinct ways for a plaintiff to prevail—either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Summa*, 708 F.3d at 130 (quoting *Gordon*, 232 F.3d at 117 (internal quotation marks omitted).

As for Plaintiff's suspension, he argues that Defendant's explanation is mere pretext because the suspension occurred only two months after his complaint. However, temporal proximity of the alleged adverse employment action to the triggering event is insufficient, on its own, to raise a triable issue of fact to overcome a motion for summary judgment. *See, e.g., Ben-*

*Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 28 (2d Cir. 2013) (summary order) ("While [plaintiff] demonstrates that his February 2010 internal complaint of discrimination and retaliation was followed by his removal as project manager on an important project by just two days, this temporal proximity—while enough to support a prima facie case—is insufficient to establish pretext."). Plaintiff also asserts that Defendant's explanation is pretextual because his suspension was a product of selective enforcement. The Court has already addressed the insufficiency of Plaintiff's evidence of "selective enforcement" and "disparate treatment." Therefore, Plaintiff has failed to offer evidence demonstrating pretext, let alone that retaliation was the but-for cause of his suspension.

*    *    *

Accordingly, the Court grants Defendant's summary judgment motion with respect to Eka's Title VII and NYSHRL retaliation claims in their entirety.

### D.    New York City Human Rights Law Claim

Plaintiff also claims discrimination and retaliation under the New York City Human Rights Law ("NYCHRL"). NYCHRL claims must be analyzed "separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *Ya-Chen Chen*, 805 F.3d at 75 (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)); *see also id.* ("New York courts . . . have approached discrimination and retaliation claims under a similar framework."). The Court considers "the totality of circumstances," and while courts may dismiss "'truly insubstantial cases,' even a single comment may be actionable in the proper context," for purposes of the NYCHRL. *Mihalik*, 715 F.3d at 109. "Summary judgment is appropriate if the record establishes as a matter of law that discrimination or retaliation played no

role in the defendant's actions." *Id.* (citation and quotation marks omitted) (alterations in original omitted).

### 1. Discrimination & Hostile Work Environment

Because claims for discrimination and hostile work environment are governed by the same provision of the NYCHRL, they are analyzed under the same standard. *Bacchus*, 137 F. Supp. 3d at 246; *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 49–50 (E.D.N.Y. 2013) ("The NYCHRL does not differentiate between discrimination and hostile work environment claims."). To defeat summary judgment on a discrimination or hostile work environment claim, the plaintiff "need only show that her employer treated her less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8. The employer may then "present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination," but is entitled to summary judgment only if "the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." *Id.* (quoting *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 40 n. 27 (2009)).

Even under the more forgiving NYCHRL standard and for the reasons set forth in the Court's analysis of the third element of Plaintiff's Title VII and NYSHRL claims, Eka has not provided sufficient evidence that discrimination played a role in Joseph's decision to suspend Eka or to recommend his suspension. *See, e.g., Fenner v. News Corp.*, No. 09–CV–09832, 2013 WL 6244156, at *14 (S.D.N.Y. Dec. 2, 2013) (granting summary judgment to defendants on NYCHRL discrimination claim where plaintiff argued that "they were treated worse than their white colleagues in a multitude of ways—lower pay, inferior assignments, dismissive supervisors, less access to resources—but they have not supported their allegations with evidence that white employees were treated better"). However, because Plaintiff has provided some evidence that other non-Nigerian employees received extra shifts and overtime instead of him and Brookdale

has not even presented evidence of its legitimate non-discriminatory motives explaining this, Plaintiff's NYCHRL discrimination claim based on denial of extra shifts and overtime survives Defendant's summary judgment motion.

2.  Retaliation

NYCHRL's retaliation provision is broader than Title VII's coverage and protects plaintiffs who "oppose any practice forbidden under the [NYCHRL] from conduct reasonably likely to deter a person engaging in such action." *Ya-Chen Chen*, 805 F.3d at 76 (citation and quotation marks omitted) (alteration in original omitted). "[T]o prevail on a retaliation claim under NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) (summary order) (citation and quotation marks omitted). Even under the more permissive NYCHRL standard and for the reasons discussed *supra* at section II.C, *see Mihalik*, 714 F.3d at 108–09, Plaintiff cannot establish a retaliation claim, as his evidence consists of his own speculation that he was suspended and denied a new position because of his complaints.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. The Court grants summary judgment to Defendant as to Plaintiff's Title VII and NYSHRL discrimination claims based on his suspension, Title VII and NYSHRL retaliation claims, and hostile work environment claim (other than the claim based on denial of extra shifts and overtime). As for Plaintiff's NYCHRL claims, the Court grants summary judgment to Defendant with regards to Plaintiff's retaliation claim, discrimination claim based on the suspension, and hostile work environment claim.

Plaintiff is permitted to proceed to trial on his Title VII and NYSHRL discrimination claims and hostile work environment claims and his NYCHRL discrimination claim, all based on the alleged denial of extra shifts and overtime.  The parties shall submit a joint pre-trial order by May 15, 2017.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 29, 2017
        Brooklyn, New York